RADIO TAXI SERVICE, INC., A NEW JERSEY CORPORA-
TION, PLAINTIFF-APPELLANT, v. LINCOLN MUTUAL
INSURANCE COMPANY, A NEW JERSEY CORPORATION,
DEFENDANT-RESPONDENT.

Argued November 10, 1959—Decided January 11, 1960.

*Mr. Stanley W. Greenfield* argued the cause for plaintiff-appellant.

*Mr. Samuel A. Larner* argued the cause for defendant-respondent (*Messrs. Budd, Larner & Kent,* attorneys).

The opinion of the court was delivered by
FRANCIS, J.  A taxicab of the plaintiff Radio Taxi Service, Inc. was involved in a collision with an automobile owned and driven by Annette E. Myers.  The cab was insured under an automobile liability policy issued by defendant Lincoln Mutual Insurance Company, which contracted to pay all sums up to $5,000 for which Radio became obligated by reason of the liability imposed by law for damages arising

out of its operation. Mrs. Myers sued Radio for damages on account of the injuries and consequential losses sustained in the accident. Defendant carrier undertook investigation of the mishap and the preparation for and defense of the action. The case went to trial and resulted in a jury verdict for the injured woman in the sum of $13,500. The insurer's contractual liability being limited to $5,000, Radio became responsible for the $8,500 balance of the judgment. Action was then brought on the policy to recover the amount of the excess. The complaint charged that defendant insurer failed to use due care in investigating the accident and in preparing the automobile case for trial, and was guilty of negligence and failure to act in good faith ·in refusing to accept an offer to settle the Myers claim within the $5,000 limit of the policy. After the plaintiff had submitted its proof on these issues at the trial, the Law Division of the Superior Court granted defendant's motion for a judgment of dismissal. An appeal was taken to the Appellate Division and we certified it prior to argument there.

As indicated by the complaint, the plaintiff's cause of action is predicated upon two claims of breach of duty by defendant, (1) failure to exercise due care in investigating the accident, and (2) breach of an obligation to settle the claim within the policy limit. As to the first, the contract of insurance obliges the insurer to defend any suit within the subject matter of the coverage, even if groundless, false or fraudulent. There is a further proviso that the company "shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient" by it.

The parties are in agreement that the provisions with respect to investigation of claims, considered in relation to the whole of the undertaking, impose upon the carrier the duty of exercising reasonable care in doing so. We have examined the evidence adduced to support the assertion that the defendant failed to use such care in investigating the circumstances of the accident, in interviewing a certain

witness, and in preparing the case for trial. Assuming that the criticized action or inaction raised a jury question of negligence, the record is barren of any indication that such conduct was a proximate cause of the adverse jury verdict.

■ The claim with respect to negligence in investigation concerns the failure to interview a young boy who, the taxi driver said in his statement, ran across the street from the southwest to the northeast corner of the intersection where the accident took place as the cab approached the stop sign at the southwest corner. The driver asserted he stopped not only for the stop sign but also because of the presence of the boy. Nothing further appears in the record to indicate that the boy saw the taxicab (which would be approaching from the rear as he was running) or knew whether it stopped, or that he had any information which would throw light on the manner in which the mishap occurred. Moreover, in the present case where it is charged the carrier did not use due care to protect its insured because of the failure to visit this boy, attention is drawn inevitably to the fact that neither the plaintiff nor its driver nor experienced trial counsel produced him at the trial. He was known to them and if he knew anything which would have supported their suit, it is difficult to believe he would not have been brought in as a witness. If there are any inferences to be drawn at all, in the light of the nature of the criticism of the insurer, they must be adverse to the plaintiff. If it was negligence for the insurer not to interview the boy, by the same process of reasoning it was at least as negligent for counsel for plaintiff or his investigator to fail to seek him out and produce him at the trial of this policy suit. Such conclusion should follow because in order to support plaintiff's position it was essential to show that the boy had knowledge which would have thrown light on the issue of negligence at the trial of the accident case. But a finding that counsel's fault in that respect renders him responsible for the loss of the present case at the trial level without any proof that such failure was related in cause to the loss would rest in sheer

speculation or conjecture and could not be tolerated in the law. It is likewise intolerable as to the carrier. Obviously, therefore, the alleged negligence of the one could not be considered the proximate cause of the loss of the accident suit, nor the alleged negligence of the other be deemed the proximate cause of the loss of the present case. Accordingly, on the facts we find no jury question on this issue.

▮ The second basis for the asserted liability of the carrier for payment of the excess of the judgment over the policy limit arises from the failure to settle the injury claim before or during the trial. It is undisputed that down to the beginning of the trial a compromise within the $5,000 maximum coverage was possible. The proof is silent as to whether the offer remained open throughout the trial.

The duty of an insurer to accept a proffered settlement which is within the available coverage has been expressed by courts throughout the country in two forms. One group espouses the rule that the carrier must act in good faith in considering offers to compromise. The other group has adopted the negligence test, that is, the carrier is liable for the excess judgment if it fails to settle when a reasonable man with unlimited exposure in the exercise of due care would have settled. Appleman, whose exhaustive work on insurance was published in 1942, says that the former was the old majority rule but that it is "tending to become the minority rule, being displaced by the rule of negligence." 8 *Appleman, Insurance Law and Practice* (1942), § 4712, pp. 76–77. On the other hand, a detailed annotation in the American Law Reports published in 1955 declares that the "great majority of the cases" have proclaimed the good faith doctrine. *Annotation,* 40 *A. L. R. 2d* 168, 171, 178. The occasion for adoption of a definitive position has not arisen previously in New Jersey. *Cf. McDonald v. Royal Indemnity Ins. Co.,* 109 *N. J. L.* 308 (*E. & A.* 1932).

These two tests of liability which have evolved from the cases are necessarily general, and at times the line of demarcation between them, as well as that between failure to exercise

due care in investigation and breach of the duty to settle, is difficult to discern. For example, a failure to exercise due care in the investigation of a claim might well make it impossible to fashion a good faith evaluation of a case for settlement purposes. See *Keeton, "Liability Insurance and Responsibility for Settlement,"* 67 *Harv. L. Rev.* 1136, 1140–1141 (1954).

██ Search for the just rule must be engaged in with an understanding that the purpose of insurance of this type is to protect the insured from liability within the limits of the coverage. And in interpreting the policy, the courts cannot allow the insurer to frustrate that purpose by a selfish decision as to settlement which exposes the insured to and results in a judgment beyond the specific monetary protection which his premium has purchased. In this case, the record presented does not call for acceptance or application of one or the other of the two principles because, in our opinion, the facts adduced do not evidence a violation of either one, and we must conclude that the trial court was correct in ordering judgment for the defendant. But since our reports contain no definitive ruling on the basic issue involved, it seems advisable to announce the principle which gives fair and just recognition to the interests of both parties to the insurance contract. For that purpose, we hold that the obligation assumed by the insurer with respect to settlement is to exercise good faith in dealing with offers of compromise, having both its own and the insured's interests in mind. And it may be said also that a reasonably diligent effort must be made to ascertain the facts upon which a good faith judgment as to settlement can be formulated. *Southern Fire & Casualty Co. v. Norris,* 35 *Tenn. App.* 657, 250 *S. W. 2d* 785 (*Ct. App. 1951*); 40 *A. L. R. 2d supra,* at *pp.* 208–210. In the present instance, we find no proof to indicate that any omission in the matter of investigation of the facts in any wise affected the settlement negotiations.

In considering cases such as this, and even though the fact does not affect the insurer's duty, it is not amiss to

have in mind that the insured has purchased a specified amount of coverage for an agreed premium and that more substantial monetary limits were available for relatively smaller additional premiums. See *Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co.,* 28 *N. J.* 554, 564 (1959). The company, by the contract, reserved the right to control the settlement of claims. Such right is a necessary incident of the operation of its business. Because the insured is prohibited from interfering with this right, however, manifestly its exercise must be accompanied by considerations of good faith. A decision not to settle must be an honest one. It must result from a weighing of probabilities in a fair manner. To be a good faith decision, it must be an honest and intelligent one in the light of the company's expertise in the field. Where reasonable and probable cause appears for rejecting a settlement offer and for defending the damage action, the good faith of the insurer will be vindicated. *Hall v. Preferred Acc. Ins. Co. of New York,* 204 *F.* 2d 844, 40 *A. L. R.* 2d 162 (5 *Cir.* 1953) ; and compare the definition of good faith in the Uniform Sale of Goods Law. *R. S.* 46:30–1.

Concededly, the administration of the good faith test is not easy for either party to the insurance contract. Many elements, both objective and subjective, enter into the fashioning of an honest decision to proceed to trial. Considerations of experience, expertise and judgment are particularly important and significant. The problem of proof of bad faith is not an inconsequential one for the insured. But in these days of liberal pretrial discovery, the burden has been considerably lightened. On the other hand, from a practical standpoint if a mere mistake of honest judgment (based upon a post-verdict appraisal) were said to create a jury question, the obvious danger cannot be ignored that a jury in the policy suit in order to impose liability upon the carrier for the excess, would require little more proof than the fact of rejection of an offer to settle within the policy limit, and a verdict at the trial in excess thereof. This troublesome problem has led to a proposal for the adoption of a rule

placing upon the insurer the burden of proving freedom from fault in any case where a compromise has been rejected, but reserving to the court, as an issue of law, the determination of whether the offer should reasonably have been accepted. See 40 *A. L. R. 2d supra,* at *p.* 173. Of course, we do not pass upon the propriety of such a suggestion or find any need to apply it in this case.

As noted above, our examination of the proof reveals no violation of the requirement to exercise good faith. This is clearly demonstrable by an examination of the factual situation with respect to liability of the cab driver for the accident and the nature of Mrs. Myers' injury claim as known to the carrier and the persons acting for it when a pretrial settlement offer of $3,600 was submitted.

The cab driver was proceeding in an easterly direction on the right side of Cherry Street, Rahway, New Jersey. It was a clear, dry day. He told the carrier's investigator (and the police at the scene of the accident) that he had stopped at the stop sign at the southwest corner of Cherry and Campbell Streets before attempting to pass through the intersection. After doing so, he proceeded to cross and when two-thirds of the way over, his cab was struck a heavy blow on the left side center and toward the rear by the front of Mrs. Myers' car, which he said she was driving at an excessive rate of speed in a northerly direction on Campbell Street. The impact was severe enough to spin the cab around, after which the Myers car went up over the southeast curb and struck the porch of a hotel located there, causing a portion of the porch to collapse. Police photographs of the cab showed extensive damage in its center and to both doors and the frame. Even the top was buckled in the direction from which the blow came. The entire front and side of the cab back to the first door were unmarked from the collision. The nature of the damage furnished strong corroboration of the cab driver's assertion of Mrs. Myers' excessive speed.

Shortly after the mishap, Mrs. Myers gave a signed statement to the insurer's investigator to the effect that she had not seen the taxicab until the collision was unavoidable. A passenger in her car who had been sitting in the right front seat signed a similar statement.

On the statements of these persons, the photographs and the inferences from the physical facts attending the mishap, plainly the carrier was justified in concluding that Mrs. Myers' claim of freedom from sole or contributory negligence was not a very credible one. But the defendant's claims manager is charged with bad faith in rejecting the settlement proposal because he testified that at the time of a telephone conference with his company's trial counsel just before the jury was drawn, he did not know of and did not consider a signed statement of a witness who said he saw the accident and that the taxi driver did not stop at the stop sign before proceeding across the intersection. At an earlier point in his testimony, however, in stating the factors he took into consideration in refusing to pay $3,600 in settlement, specific mention was made of that witness and a portion of his statement. How the inconsistency arose does not appear. But the important fact is that trial counsel had the company's file containing the witness' statement and was aware of its contents when discussing the proposed settlement with the claims manager. Moreover, the witness had said that at the time of the accident he was sitting at an overhead railroad station waiting for his mother to come in on a train. The physical situation was such (according to the photographs) that one looking toward the railroad tracks would be looking away from the intersection—although the witness said the position he occupied directed his gaze toward the accident scene. In any event, the photographs also show the station platform to be a substantial distance away, that a large brick building is built right up to the sidewalk at the intersection and that its corner is about on a line with the stop sign allegedly passed by the cab driver. It was undisputed that the witness did not

see the cars actually collide. And although familiar with his assertions, defense counsel testified that under all the circumstances of the case he felt, in terms of probability, a jury verdict for the defendant would result from the trial. It seems likely that the insured was not concerned about the outcome either from the standpoint of liability or excess verdict. The attention of the president of the insured was called by the carrier to the fact that the *ad damnum* clause of the complaint exceeded his policy coverage and that he was at liberty to engage his own attorney to cooperate with carrier's counsel. He declined the offer. Further, he was aware of the day of trial of the case but apparently decided there was no cause for concern and did not attend.

Reference is directed to a comment said to have been made by the trial court after the verdict for Mrs. Myers and during the argument of a motion for a new trial that the proof showed "lopsided liability" in favor of the injured plaintiff. The remark was excluded expressly at the trial of this case and the allusion to it is improper. Additionally, it is obvious that such statement could not have been considered by a jury in deliberating upon the issue of whether the decision of the carrier not to settle the case resulted from a good faith judgment. A jury would be confined to an evaluation of the facts on which that judgment was reached.

In any event, such a notion is not consistent with the fact that at 7 P. M., after the jury had been deliberating for 3½ hours, they were recalled by the court who said that "since it is such a comparatively simple case, I thought that I would call you in, with the consent of counsel, and ask the forelady if she can state whether she thinks there is any possibility of agreeing at all." The forelady replied: "The way it stands now, I can't see any agreement at all." She indicated also that her fellow jurors "did ask to have your talk to the jury summarized." After the further statement by the court that "it is too bad that time is wasted and at the same time everybody concerned wants to see justice

done in the case. \* \* \*," and some discussion at side bar with counsel, the jurors were sent back with the suggestion that they "write down the question of law that you want to be instructed on, if that is what is bothering the jurors." They returned in three-quarters of an hour with a 10–2 verdict for the plaintiff. In addition to this circumstantially informative situation, it is our judgment that the facts known to defendant before the trial do not warrant an inference of bad faith in concluding that from a liability standpoint the case was not worth $3,600 in settlement.

Obviously, the matter of settlement and particularly the amount to be paid depends upon two factors, responsibility for the accident and extent of the injuries and out of pocket losses. And when the settlement demand of $3,600 was submitted, the claims manager and the trial attorney had before them the results of defendant's investigation. The file revealed that after the collision Mrs. Myers was taken to the hospital. According to the history, there was no unconsciousness after the impact. On admission, she complained of pain in the left chest. X-rays revealed a simple transverse fracture of the left seventh rib with the fragments in good alignment and apposition. A *hematoma* (black and blue bruising) of the left elbow was also diagnosed.

An examination was made by defendant's physician about two months after the accident. The doctor said that such simple fractures of the ribs usually heal in from four to six weeks. His findings showed a normal rib contour and no evidence of any injury at that time. Mrs. Myers complained of pain in the chest but the complaints were of such character as to convince him that they were not credible. And in her sworn answers to interrogatories in the damage suit, she said that she had "actually" recovered from the chest and rib condition. She said also in another answer: "I seem to have recovered as to injured chest and rib." On the occasion of the medical examination, she "pointed out the prominence of the left forearm below the elbow over

the tracheoradialis muscle as having been injured." · There was not objective sign of any injury present, however, and there was a completely normal range of motion in the left arm and shoulder. Moreover, there was normal pronation and supination of the forearm at the elbow and normal flexion and extension of the forearm at the elbow without complaint. But she complained of pain on the lightest pressure on the forearm and also when the doctor attempted to place her left hand and arm behind her back. Mrs. Myers is a practical nurse with hospital experience and on the basis of the doctor's study of her, he felt that she was definitely exaggerating her complaints. In this connection, she told him that no treatment had been given to the arm up to that time and it may be noted that no such treatment is shown on the hospital record. She said, however, that she had been massaging it. In answering the interrogatories on this subject, she asserted "injury under left shoulder and arm probably permanent." At the trial of the damage action, no doctor spoke of a shoulder injury and no such condition appeared in the hospital records. Moreover, at that trial, her doctor diagnosed her ailment as "epicondylitis of the left upper extremity," commonly called "tennis elbow." But her complaint to defendant's examining physician was of the forearm below the elbow. And there was no mention of epicondylitis in the answers to interrogatories. At the trial also her orthopedic witness conceded there was no swelling about the left arm or shoulder and all motions of the arm and elbow were normal. However, he believed her complaints of pain because he said they followed the "pattern" of the ailment he had diagnosed and which he believed would be permanent. Of course, the trial testimony referred to had not been given as yet when the pretrial settlement conference took place. The reference is made only to demonstrate that there was a sharp issue as to the credibility of Mrs. Myers' testimonial assertions about the nature and extent of her injury, and an equally sharp issue among the medical witnesses on the same subject. But more important, the proof provides sub-

stantial support for defendant's view when settlement was discussed that on all the circumstances of the case Mrs. Myers' adjustment demand of $3,600 should be rejected.

Plaintiff criticizes defendant's claims manager in connection with the following question and answer he gave when being examined about the settlement discussion:

"Q. Then, Mr. Roberts, you knew at that time that there was a claim of probable permanent injury to the left shoulder and arm, did you not, sir? A. Yes, but I don't deal in probabilities, Mr. Greenfield."

The answer is disparaged as "callous." Wrenched from context perhaps some justification exists for the criticism. But in the framework of the witness' entire testimony and particularly at the point where it appears, the answer provides no reasonable inference that at a settlement conference more than 20 months earlier, bad faith was exercised in rejecting the settlement demand. The question and answer came after 4½ pages of explanation as to why he declined to pay $3,600 in settlement. The explanation was based on the facts of his investigation of liability for the accident and the injuries suffered by Mrs. Myers. Included in his statement were references to substantially all of the facts that have been outlined above, except, of course, those which were adduced at the trial of the damage action. Thus, when the witness said that he did not deal in probabilities, plainly he implied that he was dealing with the medical facts as the investigation had disclosed them and that they were inconsistent with a claim of probable permanent injury to the left shoulder and arm.

In any event, defendant's claims manager was not alone in his view that the settlement demand was unreasonable. His trial counsel agreed and in his testimony in this case not only said that the probable outcome of the trial would be a verdict for the defendant but also that even if mistaken in his prognosis an adverse verdict would be a "couple of thousand dollars at most." And counsel for Mrs. Myers, when called as a witness by plaintiff in this case, without

objection (and we are not asked to rule upon its admissibility) expressed his feeling at the time of the original trial to be that if he obtained a verdict it would be greater than $3,600. He did not say, however, how much greater it would be; more particularly, he did not express the view that he thought it would exceed $5,000, defendant's policy limit. He conceded also that the verdict might have been less than his demand and that there might have been a verdict for the defendant.

On the whole record we find nothing in the facts to warrant an inference sufficient to raise a jury question that the insurer did not exercise good faith in reaching the conclusion that Mrs. Myers' case did not have a settlement value of $3,600. Liability to pay the excess of a verdict over the amount of the policy coverage does not depend upon the mere happening of the unexpected event. The law does not expect an insurer to be gifted with powers of divination or of accurate prophecy. *American Casualty Co. of Reading, Pa. v. Howard,* 187 *F.* 2d 322 (4 *Cir.* 1951). The requirement is due care in investigation and good faith in dealing with offers of settlement. The ultimate question is not whether a verdict in excess of the policy limits should have been anticipated but whether the insurer lacked good faith in deciding not to meet the settlement demand. Mere failure to settle within the policy limit when there was an opportunity to do so before or during trial is not evidence of bad faith. *Appleman, supra,* § 4711, *p.* 73. The fact that the policy limit was exceeded by the verdict, in the light of hindsight may indicate a mistake of judgment. But such a mistake when resulting from a decision made with good faith regard for its own and the insured's interests does not confer a cause of action on the insured for the excess. For some examples of bad faith, see *Mendota Electric Co. v. New York Indemnity Co.,* 169 *Minn.* 377, 211 *N. W.* 317 (*Sup. Ct.* 1926) ; *McCombs v. Fidelity & Casualty Co. of New York,* 231 *Mo. App.* 1206, 89 *S. W.* 2d 114 (*Ct. App.* 1935) ; *Dumas v. Hartford Accident & Indemnity Co.,* 94 *N. H.* 484,

56 *A. 2d* 57 (*Sup. Ct.* 1947); *Douglas v. United States Fidelity & Guaranty Co.,* 81 *N. H.* 371, 127 *A.* 708, 37 *A. L. R.* 1477 (*Sup. Ct.* 1924).

Anyone familiar with the evaluation of accident cases for settlement purposes, when acting either for the plaintiff or the defendant, is aware of the difficulties that beset the task. Those gifted with expertise in the field of judging issues of liability and extent of injury actually suffered by a plaintiff, would probably be the first to admit that an informed judgment arrived at in good faith after reasonably diligent investigation represents the limit that should be demanded of human capacity.

In this case, no facts were presented which would warrant a finding that the defendant was unduly venturesome at the expense of the insured, or that the danger of an adverse verdict in the accident case was so great as to create an inference of bad faith in rejecting the settlement offer, or that the decision not to meet the settlement demand sprang from optimism unrelated to the realities of the case. In such a situation, to allow a jury to review the decision not to accept the settlement offer is to subject every such case where the verdict exceeds the policy limit to reappraisal by their uninformed judgment. Such a course would empty of significant content the contractual stipulation which places control of settlement in the hands of the insurer.

Affirmed.

JACOBS, J., joined by BURLING, J. (dissenting). We hold the view that an insurance company's relation to an assured whose defense it is conducting bears fiduciary aspects and that it may justly be considered under obligation to act in good faith and with due care not only in its investigation and defense but also in its handling of any settlement offer which would remove the assured's jeopardy of a judgment exceeding the policy coverage. See *Dumas v. Hartford Accident & Indemnity Co.,* 94 *N. H.* 484, 56 *A. 2d* 57 (*Sup. Ct.* 1947). And we are satisfied that, in the instant matter,

the assured's evidence that the insurance company defaulted not only in its investigation but also and more particularly in its handling of the settlement offer was sufficient to withstand the insurance company's motion to dismiss at the end of the assured's case; although there was evidence from which other inferences might be drawn, the assured was clearly entitled at the close of its case to the full benefit of all of its favorable testimony and the inferences which a jury might draw therefrom. See *Marlin v. Bengue, Inc.*, 25 *N. J.* 359, 362 (1957).

In *Shellhammer v. Lehigh Valley Railroad Co.*, 14 *N. J.* 341, 345 (1954), Justice Heher pointed out that the true question at the close of the plaintiff's case is whether the jury could "on any reasonable view of the evidence, rejecting all evidence and inferences unfavorable to the plaintiff," find that the plaintiff has established the facts essential to its cause of action. In its treatment of the evidence the majority has not really addressed itself to that question but has dealt with the matter as if this court, rather than the jury, were the proper trier of the facts. In the process it has reversed the traditional course by accepting the evidence which it views to be favorable to the insurance company while rejecting the unfavorable evidence which it acknowledges to be inconsistent but seeks to explain away. However, this in no wise eliminates from the record the evidence which is favorable to the plaintiff nor does it justify its judicial rejection without calling upon the defense for its testimonial version of the circumstances; and it ignores the many decisions in our State which hold that where there are inconsistencies in the plaintiff's case it is nonetheless entitled, on a motion for dismissal, to the benefit of "so much of the evidence" as is favorable to its claim. See *Kozlowski v. Pavonia Fire Ins. Co.*, 116 *N. J. L.* 194, 200 (*E. & A.* 1936); *Repasky v. Novich*, 113 *N. J. L.* 126, 129 (*E. & A.* 1934); *Weinstein v. Weinstein*, 10 *N. J. Super.* 68, 72 (*App. Div.* 1950).

It is admitted that the injured party had duly made an offer of settlement in the sum of $3,600. The offer was,

summarily and without counter proposal at any time, rejected by the insurance company's claims manager who has made sworn admissions from which a jury could readily infer that he did not act in good faith and with due care for the protection of the assured which was in danger of a judgment in excess of the policy limit of $5,000. His admissions were unequivocal and included the following: (1) although the insurance company had the name and address of a young boy (who according to a statement given to it by the assured's driver had run in front of his car before the accident) it never made any effort to interrogate him; (2) although the insurance company's file contained a statement by the sole disinterested witness that the assured's driver had not stopped though he came out of a stop street, he did not know about the statement when he rejected the settlement offer; (3) although he knew that there was a claim by the injured party of probable permanent injury he did not "deal in probabilities"; and (4) although he received the offer of settlement before the trial began he made no inquiries and took no steps whatever towards ascertaining what testimony could be expected from the treating physicians (Drs. Golden and Lepree) as to the condition of the injured party at that time.

Indeed, the claims' manager went further and said that although he was aware that Dr. Lepree was a very competent orthopedist it would have made no difference to him, in evaluating the claim for purposes of settlement, what opinion as to the nature and permanency of the injuries was expressed by Dr. Lepree; and along the same lines he said that it would have made no difference to him what the sole disinterested witness said in his statement as to the failure of the assured's driver to stop at the stop street. There was evidence indicating that the assured was never notified of the offer of settlement and that although the likelihood of a substantial verdict in favor of the injured party appeared early during the course of the trial, the insurance company never took any affirmative steps to reopen the settlement discussion. See *Ballard v. Citizens Cas. Co. of New York,* 196

*F. 2d* 96, 103 (7 *Cir.* 1952). The transcript of the trial was introduced in evidence and discloses that the injured party presented not only her own testimony but also that of her passenger, her treating physicians and the sole disinterested witness who testified that he did not see any boy run in front of the taxicab and that the assured's driver had come out of the stop street without stopping at all. The injured party testified fully as to the accident and her resulting injuries and as to her medical expenses, car damages and loss of earnings which apparently aggregated almost $2,500; she also testified that the statement which she gave to the insurance company was obtained by its investigator while she was under heavy sedation in a hospital bed and while she lacked her reading glasses. The insurance company did not offer its investigator as a witness; indeed its only witnesses were the assured's driver who was a highly interested defendant in the proceeding and its doctor who was hardly in any position to controvert the testimony by the injured party's treating physicians as to the permanency of her elbow injury because, as he testified, he never made any diagnosis of the elbow injury. A jury could undoubtedly find from the trial transcript that the testimony weighed heavily in favor of the injured party on both issues of liability and damages; in this connection it is interesting to note that when Judge Hughes refused to interfere with the jury's verdict of $13,500 against the assured and its driver, he expressed the view that "there was a lopsided case here of proof as far as liability was concerned."

Before a settlement offer can conscientiously or intelligently be passed upon, the readily available evidence which is adverse as well as favorable must be fairly considered and weighed; a jury could find that, in the instant matter, the claims manager did not do that at all but that, on the contrary, he considered only the evidence he had supporting the defense; and a jury could infer, in the light of the claims manager's admissions and all of the circumstances, that he was willing to gamble on obtaining a favorable verdict from the jury

(thereby sacrificing the interests of the assured and continuing its jeopardy) only because he was improperly influenced by the fact that the insurance coverage was so little above the settlement offer. *Cf. Henke v. Iowa Home Mutual Casualty Company,* 97 *N. W.* 2d 168, 175 (*Iowa Sup. Ct.* 1959). Even the authorities which speak only in terms of a good faith obligation on the part of the insurance company rather than one of both good faith and due care would recognize the legal sufficiency of the assured's showing here on the motion to dismiss at the end of its case. Thus in *Radcliffe v. Franklin National Ins. Co. of New York,* 208 *Or.* 1, 298 *P.* 2d 1002, 1024 (1956), the Oregon Supreme Court, in reversing a trial court's action directing a judgment in favor of the insurance company, noted that "only a decision made by one who exercised due diligence in appraising himself of the material facts is entitled to respect as made in good faith," and that "an insurer, upon receiving a settlement offer in a case such as this in which an excess verdict is sought, owes a duty to inform the insured so that the latter may take whatever course that is necessary for the protection of his own interests in the event the insurer rejects the offer." In *Hilker v. Western Automobile Ins. Co.,* 204 *Wis.* 1, 235 *N. W.* 413, 415 (*Sup. Ct.* 1931), the court stated that the insurance company's rejection of a settlement offer should be an honest and intelligent one and that "it must be based upon a knowledge of the facts and circumstances upon which liability is predicated, and upon a knowledge of the nature and extent of the injuries so far as they reasonably can be ascertained"; it stated further that this placed upon the insurance company an obligation "to make a diligent effort to ascertain the facts upon which only an intelligent and good-faith judgment may be predicated." In *Brown v. Guarantee Insurance Company,* 155 *Cal. App.* 2d 679, 319 *P.* 2d 69 (*D. Ct. App.* 1958), the court outlined various factors which it considered pertinent on the issue of the insurance company's good faith, including, *inter alia,* "the failure of the insurer to properly investigate the circum-

stances so as to ascertain the evidence against the insured."
In *Ballard v. Citizens Cas. Co. of New York, supra,* the
court, in sustaining a verdict against an insurance company
for its improper rejection of a settlement offer, referred to
the circumstances which indicated the danger of a verdict
in excess of the policy limit and had this to say:

"* * * the company never offered to settle, even on the basis
of nuisance value, and rebuffed each offer of settlement: the written
offer forty days before the date of the trial to settle for $4,000, to
which no reply or counter-offer was made; the written offer three
weeks before trial to settle for $2,500, to which the attorney for the
company replied he was not interested in a settlement for the face
of the policy; and the offer made upon the morning of the first
day of the trial to settle for $2,000, which was rejected by the de-
fendant's attorney's rather curt statement, 'I am not interested in
the settlement.' Even after the case turned 'sour,' the company's
attorney did not show any interest in attempting to settle the
case, and did not report to the insurance company the rapidly
deteriorating situation. We think that under such circumstances
a jury question was presented on the issue of good faith in the
matter of settlement, and that substantial evidence supports the
verdict." 196 *F. 2d,* at *pages* 102–103

In *Dumas v. Hartford Accident & Indemnity Company,*
*supra,* there was an automobile accident resulting in a law
action by the injured party against the assured whose in-
surance coverage was $5,000. The injured party offered to
settle for $4,000 but the insurance company rejected the
offer and the case went to trial resulting in a verdict of
$12,000. The insurance company paid $5,000 and the assured
paid the balance. He then sued the insurance company,
charging that it failed to exercise due care in the handling
of the settlement offer and he obtained a favorable verdict
from the jury. This was sustained by the Supreme Court of
New Hampshire which expressed the view that the insurance
company is under an obligation of due care and that in
deciding whether or not to settle it "must be as quick to
compromise and dispose of the claim as if it itself were liable
for any excess verdict"; it found that there was "evidence
from which the jury could find negligence on the part of

the defendant in failing to settle" and in the course of its opinion said:

"Something more than an act of judgment is involved in the decision of the insurer to stand trial or to settle. A judgment carefully arrived at must be accompanied by conduct consistently therewith. So far as its interest is concerned, there must be a willingness within the policy limit reasonably to spend its money in purchasing immunity for the insured. Due care must be exercised in ascertaining all the facts of the case both as to liability and damages, in learning the law and in appraising the danger to the insured of being obliged to pay the excess portion of a verdict. While the insurer has a reasonable right to try its case in court, it cannot be unduly venturesome at the expense of the insured. The caution of the ordinary person of average prudence should be employed." 56 A. 2d, at *page* 60

See Note, "Liability of insurer for failure to settle suit," 62 Harv. L. Rev. 104, 106 (1948); Annotation, Duty of liability insurer to settle or compromise, 40 A. L. R. 2d 168, 186 (1955).

If during its investigation the insurance company had interrogated the young boy it would have obtained information which would have corroborated or shed doubt on the statement of the assured's driver and would, in either event, have aided in its evaluation; if, when he received the offer of settlement, the claims manager had considered the statement by the sole disinterested witness that the assured's driver had come out of a stop street without stopping he would have been in a position to evaluate the driver's statement to the contrary and the probabilities before a jury on the issue of liability; and if at that time the claims manager had considered the injured party's claim of probable permanent damage and had made inquiries as to the testimony which could be expected from her treating physicians he would have been in a position to evaluate the insurance company's medical report and the probabilities before a jury on the issue of damages. But unfortunately the young boy was never interrogated by the insurance company and by his own admission the claims manager did not know of the state-

ment by the disinterested witness when he rejected the settlement offer and did not at that time consider the plaintiff's claim of probable permanent damage or make any inquiries as to the testimony which could be expected from her treating physicians. In the light of the foregoing and all of the circumstances, a jury could readily have found that in its handling of the settlement offer the insurance company did not fairly discharge its obligation to act in good faith and with due care and that as a result the assured was ultimately subjected to liability for the excess judgment; in our State, questions of due care and proximate causation are ordinarily left to the jury for its determination and we see no just reason for precluding that course here. See *Rappaport v. Nichols*, 31 *N. J.* 188, 203 (1959) ; *Martin v. Bengue, Inc., supra*, 25 *N. J.*, at *p.* 374; *Brower v. N. Y. C. & H. R. R. Co.*, 91 *N. J. L.* 190, 191 (*E. & A.* 1918).

We would reverse the judgment of dismissal and remand the cause for further proceedings in the trial court.

*For affirmance*—Chief Justice WEINTRAUB, and Justices FRANCIS, PROCTOR and HALL—4.

*For reversal*—Justices BURLING and JACOBS—2.