Bertil KAUDERN, Plaintiff,

v.

**ALLSTATE INSURANCE COMPANY,**
Defendant.

Civ. A. No. 479–64.

United States District Court
D. New Jersey.

Nov. 17, 1967.

84

Joseph M. Nolan, Newark, N. J., for plaintiff; Jerome M. Lynes, Newark, N. J., of counsel.

Mead, Gleeson, Hansen & Pantages, by Victor C. Hansen, Newark, N. J., for defendant.

## OPINION

COOLAHAN, District Judge:

This matter was tried before the court without a jury. It is an action by the plaintiff, Bertil Kaudern, against the Allstate Insurance Company, seeking damages for Allstate's improper investigation, assessment, and handling of a case arising out of an auto accident in which plaintiff—insured by Allstate— was involved.

It was admitted by the parties that Kaudern was insured by Allstate under a liability insurance policy which was in effect on the date of the accident, June 6, 1959. By the terms of the policy, Allstate contracted to defend in the name of and on behalf of Kaudern any claim for injuries to persons by reason of the operation of a motor vehicle then owned and operated by him. The policy also provided that Allstate would pay any final judgment which might be rendered against Kaudern, not to exceed $10,000 for any one person injured or killed and not to exceed $10,000 for each occurrence.

On June 6, 1959, Kaudern was involved in a multiple automobile collision in East Rutherford, New Jersey. Julia B. Collins was a passenger in a vehicle operated by her husband, Carroll E. Collins, and as a result of the accident she suffered extremely serious injuries, including a fractured skull, concussion of the brain, comminuted fracture of the second vertebrae, transection of the spinal cord, and a complete paralysis of her arms, legs, body, and tongue, resulting in total permanent disability. Her injuries necessitated extensive medical care, requiring hospitalization for over 15 months with constant medical and nursing attention.

On May 29, 1961, complaints were filed by Mrs. Collins and her husband in the Superior Court of New Jersey, Morris County, against Kaudern and the other owners or drivers of the vehicles which were involved in the accident. In the Collins' complaint it was alleged that Mrs. Collins was a passenger in a vehicle, owned and operated by her husband, which had been traveling east on Route 3 on the Hackensack River Bridge in East Rutherford, New Jersey, on June 6, 1959, during rainy weather conditions. The complaint alleged that all of the defendants negligently or recklessly operated their vehicles, resulting in their collision with each other and with the vehicle owned and driven by Collins. The complaint also referred in detail to the injuries suffered by Mrs. Collins, and demanded damages in the sum of $750,000 for the personal injuries suffered by Mrs. Collins and $300,000 for medical expenses and loss of services of his wife by Mr. Collins.

After the accident, Kaudern immediately notified Allstate. Allstate then commenced to make an investigation and an assessment of the case. The initial investigation by Allstate was conducted by Martin Berger, a claims examiner in the Bergenfield, New Jersey, office. Active investigation began some time in June of 1959. After reviewing the file,

Berger prepared an inter-office memorandum in which he expressed the opinion that this was a "no-liability" case. He reasoned that the Collins' car had struck the Kaudern car, and that therefore Kaudern would not be liable for any injuries sustained by Mrs. Collins. It appears from the record that Berger formed this opinion without the benefit of any of the depositions which were subsequently taken in this matter,[1] wherein it appeared to be at least questionable whether the Collins' car struck the Kaudern vehicle, or of police reports, wherein Joseph Lauricella, also involved in the accident, stated that the Kaudern vehicle struck the Collins' vehicle.

Some time in the fall of 1961 the case was transferred to Allstate's Unit III at the Clifton, New Jersey, office. Unit III is the Allstate section where certain files on which investigation has been completed are sent. Its basic function is twofold: to attempt to settle cases where liability was admitted and to prepare "no-liability" cases for trial. Subsequently, Martin Berger, author of the opinion that the Collins' suit was a "no-liability" case, was transferred from Bergenfield to Unit III, where he assumed at least titular control of the Kaudern file.

Under the terms of its policy, Allstate was obligated to provide legal assistance to Kaudern in this matter. Pursuant to this obligation Allstate engaged the law firm of Marley, Winkelried & Hillis to defend Kaudern. Kaudern was advised that the firm would be representing him, but that they would also be representing interests of Allstate, and that if Kaudern so desired he might obtain independent legal counsel to represent

him. From June 23, 1959, until August of 1961, while Berger was in charge of the Collins' claim, the Marley firm did not participate in reviewing or evaluating that file. Berger had the responsibility for handling the claim and supervising the investigation. He was also charged with decisions on liability and the possible creation of a reserve fund to cover the expense of the claims, including the cost of any eventual settlement.

When Berger made his initial determination of "no-liability", he inserted a memorandum in the file to that effect. However, he believed at the time that he closed the file that the severity of Mrs. Collins' injuries would adversely affect Kaudern and that such injuries would influence a jury on the liability question. He also noted that in the event the case were to go to a jury the chances were that the verdict would be greatly in excess of the policy limits. As the case continued to develop through further investigation, answers to interrogatories, depositions, and further material evidence, it does not appear that there was undertaken any material review of the file to reassess the question of liability.

In its demand for a statement of damages the Collinses furnished Allstate with a copy of a six page medical report detailing the injuries and expenses involved in the treatment of Mrs. Collins. Further, Allstate was supplied with the names of fourteen doctors who were in attendance at various times and the names of thirty-two private nurses who attended her from time to time during her fifteen months hospitalization. These expenses amounted to $34,843.34, as of August 31, 1961.

1. In these depositions Kaudern stated that he was driving his motor vehicle approximately 150 feet *behind* the Collins' car when the Melendez vehicle, which was 150 feet away from the Collins' car, and coming in the opposite direction, started to skid. He further testified that at the time he first noticed the Melendez car skid, his car was traveling 10 miles an hour less than Collins, and going about 25 to 35 miles per hour. At another point in his deposition Kaudern testified that Mel-

endez's vehicle was perhaps 300 to 400 feet away from him when he first observed it, and the Collins' car was just about half-way between his car and the Melendez's car. He stated that he began to brake his car when he first observed Melendez's car skid into the east bound lane of traffic, at least 300 feet away. He stated that he did not apply his brakes with full force because he was afraid of skidding.

During the pendency of the action the depositions of the Collinses were taken by one of the other defendants, although Allstate's representative was present at the time of the taking of the depositions. Depositions were also taken of Kaudern at which time Allstate's representative was present.

In February of 1962 a settlement conference was held before Judge Long of the Morris County Superior Court. This settlement conference occurred after Allstate had received a statement of the damages, medical reports, answers to interrogatories, and transcripts of the depositions. At the conference George Brown, Esq., an employee of Allstate, stated that Allstate would not contribute any amount to the settlement. Judge Long scheduled another settlement conference for March 2, 1962, but it was cancelled at the request of the attorney for the Collinses, when he was advised by Allstate that it still would not contribute anything to a settlement. Kaudern was never informed of the existence of these conferences.

On March 5, 1962, when it appeared that the case might soon reach trial, counsel for Collinses, Frank A. O'Brien,

Esq., sent a registered letter to Marley, Winkelried & Hillis, the attorneys of record for Kaudern, offering to settle for $10,000,[2] which was, incidentally, Allstate's liability limit under its policy with Kaudern. No response was made by either Marley, Winkelried & Hillis or Allstate to this letter, nor did Marley, Winkelried & Hillis or Allstate communicate with Kaudern with respect to the receipt or contents of the letter.

Thereafter, the suits by the Collinses against Kaudern and the other defendants were consolidated for trial and scheduled for June 2, 1962. Just prior to trial the Collinses were offered $5,500 by Allstate, which was rejected. The case actually went to trial on June 14, 1962. Upon submission of the case to the jury, a verdict was rendered in favor of Mrs. Collins against Kaudern and co-defendant Pedro Melendez in the sum of $75,000, and a verdict was rendered in favor of Mr. Collins against Kaudern and Melendez in the sum of $100,000. Judgment was thereafter entered on each verdict. Melendez was and is without funds and his liability on the aforesaid judgment is not covered by any insurance.

2. The O'Brien letter of March 5, 1962 read as follows:

Mr. and Mrs. Collins have authorized us to make a definite offer at this time to you to settle both of the above cases with your client, B. J. Kaudern, for the total sum of $10,000 paid to Mr. and Mrs. Collins by or on behalf of Mr. Kaudern providing, however, that acceptance of this offer, in writing is in our hands on or prior to March 16, 1962. If there is an inclination to pay this amount, the mechanics of settlement can definitely be worked out in such a way as to assure Mr. Kaudern of no further liability in these cases including, if necessary, the dismissal of both cases as to all parties.

This offer is being made at this time in this very modest amount because of the very considerable amount of work and expense which will shortly be necessary to prepare the cases for trial with the prospect of only limited actual recovery on any judgment against Mr. Kaudern despite the fact that such a judgment would undoubtedly be for a

very substantial sum in view of the personal injuries and medical expenses. Under the circumstances, therefore, it should not be expected that this offer will be available at a later date.

We acknowledge that your indications to date are that Mr. Kaudern and his insurance carrier are not inclined to contribute any sum whatever toward a settlement of these cases but we are nevertheless making the above offer to clarify any questions as to the attitude of Mr. and Mrs. Collins toward settlement at this time.

Incidentally, I spoke with Judge Long Friday afternoon and explained to him that all counsel agreed that there was no point to holding the settlement conference. At my request, Judge Long said he would mark the case off the weekly call of March 9 and, consequently, it will not be necessary for any appearances on that date. Judge Long said he would have the case set down for a subsequent weekly call for jury cases to be tried in May.

Allstate's counsel appealed from the adverse decision against Kaudern to the Superior Court, Appellate Division, and that court unanimously affirmed the verdict. Subsequent to this affirmation, Allstate, on or about November 29, 1963, made a payment of $24,575 on the judgment against the plaintiff Kaudern, but declined to make any further payments thereon, despite demands by Kaudern. The payments consisted of $10,000 on the judgment, plus all interest that had accrued through the date when Kaudern's appeal was denied. As a result of Allstate's refusal to pay more than its $10,000 policy liability plus interest, the present action was commenced.

Jurisdiction of this court is based upon diversity of citizenship and an amount in controversy in excess of $10,000, pursuant to 28 U.S.C. § 1332. The cause of action presently before the court arose in the State of New Jersey and as such we must apply the law of that state under the mandate of Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937).

■ In substance, plaintiff's complaint asserts that Allstate exercised bad faith in the preparation, investigation, and settlement negotiations surrounding the case of Collins against Kaudern, which resulted in a judgment against Kaudern greatly in excess of the limits of his policy with the insurer. Such an allegation states a justiciable controversy. See Atlantic City v. American Cas. Ins. Co., 254 F.Supp. 396 (D.N.J.1966); and Gaskill v. Preferred Risk Mut. Ins. Co., 251 F.Supp. 66 (D.Md.1966), aff'd. 371 F.2d 792 (4th Cir. 1967).

■ The area of the law involving insurers' liability for verdicts in excess of policy limit has been fraught with uncertainty from its inception. Two competing schools of liability have arisen, both recognizing the amenability of the in-surer to suit, but disagreeing as to the standard of conduct chargeable to the company. These theories have been denominated the negligence theory and the good faith theory.[3] In Radio Taxi Serv. Inc. v. Lincoln Mut. Ins. Co., 31 N.J. 299, 157 A.2d 319 (1960), the New Jersey Supreme Court determined that the state, as a matter of policy, should adopt the good faith theory. In so holding the Court stressed the following elements of that theory, 31 N.J. at 304, 157 A.2d at 322:

[W]e hold that the obligation assumed by the insurer with respect to settlement is to exercise good faith in dealing with offers of compromise, having both its own and the insured's interests in mind. And it may be said also that a reasonable diligent effort must be made to ascertain the facts upon which a good faith judgment as to settlement can be formulated.

■ The problems in this area arise from the standard clause in a liability insurance policy, present here, which provides that the insurer will defend in the name of and on behalf of the insured any claims for injuries to persons by reason of the operation of the motor vehicle owned by the insured. This clause naturally encompasses the negotiation of any settlement prior to trial.

The insurance company's obligation to defend in the name of the insured creates a conflict of interest on its part. On one hand, its interest lies in minimizing the amount of its payout; on the other, the insured's interest, which it is also supposedly defending, lies in keeping the plaintiff's award—however high—within the policy limits, so that he will not suffer any personal financial loss. The problem becomes most acute where there is a settlement offer which approximates the policy limits. The insured's desire to be free from uncer-

---

3. For an excellent discussion of the good faith and negligence theories, see Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136 (1954).

Professor Keeton stresses that the difference between these two tests is often difficult to determine. For example, negligence in the investigation of a claim may render the insurer's subsequent judgment on the question of settlement impossible under the good faith standards.

tainty, regardless of the merits of the claimed injury, so long as the settlement offer is within the policy limits, would compel him, were he to be in charge of settlement negotiations, to accept the offer. The insurance company's interest, on the other hand, is prompted by its evaluation of the liability aspects of the litigation and a desire not to expose itself to payments which do not adequately reflect the dangers which might be involved in pursuing the case to trial. When a settlement offer is made which approaches the policy limits, it may be tempting for the insurance company—pursuing its own interest exclusively—to gamble on the outcome of a trial, *their* exposure not being considerably affected by a verdict substantially in excess of the coverage.

The New Jersey Supreme Court took cognizance of these competing interests in the *Radio Taxi* case, noting that during the process of settlement negotiations and assessments by the insurer, the company must have "both its own and the insured's interest in mind." 31 N.J. at 304, 157 A.2d at 322. Recognizing specifically the situation where the settlement offer approaches the policy limits the court went on to say that:

[I]n interpreting the policy, the courts cannot allow the insurer to frustrate that purpose [the protection of the insured] by a selfish decision as to settlement which exposes the insured to and results in a judgment beyond the specific monetary protection which his premium has purchased.

Other jurisdictions having adopted the good faith rule have elucidated the manner in which the insurer must approach settlement questions which might arise. Pennsylvania has adopted a position very similar to that of New Jersey. In Bell v. Commercial Ins. Co., 280 F.2d 514,

515–516 (3rd Cir. 1960), the Court of Appeals for the Third Circuit, considering Pennsylania law, stated:

The view taken is that the insurer must accord the interest of its insured the same faithful consideration it gives its own interest: since the interest of one or the other may be imperiled at the instant of decision, the fairest method of balancing the interest is for the insurer to treat the claim as if it were alone liable for the entire amount. The insurer is not bound to submerge its own interest, but the decision to expose the insured to personal pecuniary loss must be based upon a bona fide belief by the insurer, predicated upon all of the circumstances of the case, that it has a good possibility of winning the law suit. The insurer does not have an absolute right to risk the insured's financial well-being; the insurer's obligation of good faith requires that the chance of finding non-liability be real and substantial and that the decision to litigate be honestly made.[4]

■ When considering whether the insurer has exercised the requisite degree of good faith in the preparation of the defense of the action, negotiations for settlement, and other aspects of the claim under consideration, the court in Brown v. Guarantee Ins. Co., 155 Cal.App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202 (Dist. Ct.App.Cal.1957), held the following considerations to be relevant: 1.) The strength of the injured claimant's case on the issues of liability and damages; 2.) Attempts by the insurer to induce the insured to contribute to the settlement; 3.) Failure of the insurer to properly investigate the circumstances involved in the accident, which would result in its inability to effectively weigh the evidence against the insured; 4.)

---

4. See also Brown v. Guarantee Ins. Co., 155 Cal.App.2d 679, 319 P.2d 69 (Dist. Ct.App.Cal.1957), Younger v. Lumberman's Mut. Ins. Co., 174 So.2d 672 (Ct. App.La.1965). Professor Keeton, supra note 3, suggests the following language which incorporates both the equal consideration theory and the good faith theory

as they apply to the decision by the insurer whether to settle or litigate a given case:

With respect to the decision whether to settle or try the case, the insurance company must in good faith view the situation as it would if there were no policy limit applicable to the claim.

The insurer's rejection of advice of its own attorney or agent; 5.) Failure of the insurer to inform the insured of the compromise offer; 6.) The amount of financial risk to which each party is exposed in the event of a refusal to settle; and 7.) The fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts.[5]

The New Jersey courts have adopted these considerations either directly or by implication in the *Radio Taxi* case, as have other courts in interpreting the good faith rule. See Gaskill v. Preferred Risk Mut. Ins. Co., supra; Younger v. Lumberman's Mut. Cas. Co., 174 So.2d 672 (Ct.App.La.1965). Although it is sometimes difficult to ascertain exactly which of the above enumerated considerations were paramount in any given case, it is clear that they have been employed as guidelines in determining whether the insurer had dealt fairly, honestly, and candidly with the insured.

■ Considering these criteria, we find the following relevant facts: The Collins' case was most certainly poorly characterized as being one of certain "no-liability."[6] There was a great divergence of opinion as to whether the Kaudern vehicle had actually struck the Collins' vehicle. At the very least this fact should have raised in the minds of both Allstate and the Marley firm the possibility that a jury might find that the Kaudern vehicle did come in contact with the Collins' vehicle. Added to this must be considered the statement made to the East Rutherford police that there had been contact between the two vehicles. The evidence in the case indicated that contact between the Kaudern and Collins' car took place, for the Kaudern car had damage to its front end. From the possibility of a jury finding of contact, Allstate could reasonably

5. Harbingers of a considerably more liberal rule may be found in the case of Crisci v. Security Insurance Co., 58 Cal. Rptr. 13, 426 P.2d 173 (Cal.Super.Ct. 1967). In that case the Supreme Court of California determined that, on the facts, the plaintiff was permitted to recover for an excess judgment, on the ground that the insurance company had not given consideration to the interests of the insured equal to that it gave to its own. However, there is strong dictum in that case which indicates that the courts of California are leaning towards a position which would impose strict liability upon an insurer for any excess judgment when there has been an offer of settlement within the policy limits. In discussing the proposed rule which would virtually impose that strict liability upon the insurer, the court commented as follows:

The proposed rule is a simple one to apply and avoids the burdens of a determination whether a settlement offer within the policy limits was reasonable. The proposed rule would also eliminate the danger that an insurer, faced with a settlement offer at or near the policy limits, will reject it and gamble with the insured's money to further its own interests. Moreover, *it is not entirely clear that the proposed rule would place a burden on insurers substantially greater than that which*

*is present under existing law.* The size of the judgment recovered in the personal injury action when it exceeds the policy limits, although not conclusive, furnishes an inference that the value of the claim is the equivalent of the amount of the judgment and that acceptance of an offer within those limits was the most reasonable method of dealing with the claim.

Finally, and most importantly, there is more than a small amount of elementary justice in a rule that would require that, *in this situation where the insurer's and insured's interests necessarily conflict, the insurer, which may reap the benefits of its determination not to settle, should also suffer the detriments of its decision.* On the basis of these and other considerations, a number of commentators have urged that the insurer should be liable for any resulting judgment where it refuses to settle within the policy limits. (Emphasis added.)

Although New Jersey has not adopted such a liberal rule in this area, the reasoning of the California Supreme Court seems to indicate a trend towards requiring insurance companies to act more responsibly towards their customers with respect to offers of settlement.

6. See Note 1, supra.

have foreseen the possibility of a jury verdict for plaintiff.

On the issue of damages, it will suffice to say that all parties concerned, including the Allstate claims representatives and the attorneys at the Marley firm, were acutely aware of the extensive injuries suffered by Mrs. Collins. This is evidenced by the fact that the Marley firm and the Allstate representatives believed that the injuries were so grave that, were the case to reach a jury, the extent of the injuries would have a definite effect on the jury's determination of liability.

It is abundantly clear on the record that Allstate did not advise Kaudern that he might contribute to any settlement. In fact, Kaudern was never even informed of any offers of settlement or possibilities thereof. The offers of settlement communicated to Allstate in the O'Brien letter were never made known to Kaudern. The mere fact that settlement was discussed immediately prior to trial and during the progress of the trial does not absolve Allstate of its responsibility to inquire of Kaudern whether he desired to contribute any money to a possible settlement. It is not outside of the realm of possibility that Kaudern, learning of the settlement offer of $10,000, might have been willing to contribute some or all of that amount in order to absolve himself of any possible liability in the future. At the very least, had the offers of settlement been communicated to Kaudern, he would have been afforded the opportunity of independent consultation as to the advisability of making any contributions himself.

The third element set forth in Brown v. Guarantee Ins. Co., *supra,* was the failure of the insurer to properly investigate the circumstances involved in the accident. When dealing with this aspect of the good faith rule, it is difficult to pinpoint one act or even possibly a series of acts which may have contributed to the overall mismanagement by Allstate of the Collins' claim against Kaudern. However, there are certain aspects of this case which tend to strongly indicate that the entire matter was mismanaged and negligently handled by Allstate. The highlights of this negligence may be summarized as follows: From the date of the accident until the summer of 1961 the entire investigation and evaluation of the claim was conducted by Allstate. The determination of "no-liability" made in the Bergenfield office was made prior to the taking of any depositions in this matter. It appears that a comprehensive review of the liability aspect of the file was never undertaken by either Allstate or the Marley firm. This fact is particularly important when viewed in light of the liability aspects brought out by the further discovery of Allstate and the Marley firm, specifically, the depositions of Carroll Collins, Joseph Lauricella, and Kaudern himself. As the case developed, it was apparent that the injuries suffered by Mrs. Collins were the result of several impacts and that it would be difficult, at best, for a reasonable appraisal of the liability aspects of the case to result in a conclusion of certain "no-liability."

On the fourth point, the insurer's rejection of the advice of its own attorney or agent, the record indicates that several of Allstate's claims examiners had determined that there was at least *some* question of liability, if only based on a jury's improper finding of liability due to seriousness of injuries. An example is the memorandum placed in the file by Mr. Donald Connolly, an Allstate employee, which stated that it was highly likely that there was an impact between the Collins' and Kaudern vehicles. It might be noted that, in response to this memorandum, Mr. Harry Falconer, one of the Allstate employees, replied that: "I am well aware of the severity of the injury. It is my opinion we should go all the way with this one. We have minimum coverage. I don't feel that physical examinations would benefit us. We would incur additional, unnecessary expense. As it now stands, it is obvious that the value of the case, assuming it was a case of liability, far exceeds our coverage." As for rejection of advice of counsel, it is clear that when John Bend-

er, Esq., the attorney assigned to handle this case for the Marley firm, first reviewed the file in May of 1962, he was of the opinion that the liability was not the paramount issue and that the injuries were sufficient to take the case to the jury. As an indication of his concern over this matter, he was of the opinion that no matter what the liability was, Allstate should make every effort to settle the case, including offering the full policy limits.

The end result of all of this activity was either that there was no communication between Allstate and its claims representatives and the Marley firm, or that the communicated recommendations by any of the respective parties were never acted upon by either Allstate or the Marley firm. In short, the lack of a comprehensive review of the file at various times during the progression of the case led to the inability of either Allstate or the Marley firm to intelligently make recommendations on the issue of liability and settlement.

The issue of the amount of financial risk to which each party is exposed in the event of a refusal to settle may be dealt with simply, by pointing out that since plaintiffs had never offered to settle for less than $10,000, Allstate—in view of its $10,000 policy limit—had absolutely nothing to lose by going to trial. In contrast, Allstate well knew that a jury verdict against Kaudern might possibly be very high; suit was for $1,050,000, and out of pocket expenses for the care of Mrs. Collins apparently amounted to $34,843.34 alone, by August 31, 1961. From the outset, Allstate's disinterest with settlement seems to have been motivated by a desire to gamble on the outcome of the trial.

■ Finally, in considering the possible liability of Allstate on the excess judgment rendered against Kaudern, Allstate's representation to Kaudern that they would, under the terms of their policy, undertake to provide independent legal assistance in the defense of this matter was flagranly violated by Allstate. It is absolutely clear on the record that the law firm of Marley, Winkelreid & Hillis was little more than an arm of Allstate, their benefits, salaries, and collateral expenses all being paid directly by Allstate. Although Kaudern was informed that the Marley firm would be representing both his interests and the interests of Allstate, he was certainly led to believe that he could expect independent advice from an independent law firm, not a quasi-affiliate of Allstate. Kaudern was never informed of any of the facts surrounding the "employment" of the Marley firm. Such a situation hardly squares with the mandate of Bell v. Commercial Ins. Co., *supra,* wherein the court stated that the insurer must "accord the interest of its insured the same faithful consideration it gives its own interest." 280 F.2d at 515. In the interest of fairness and good faith in its dealings with Kaudern, it was incumbent upon Allstate to either conform with its obligation under the terms of the policy and employ a truly independent law firm, or at the very least, to have indicated to Kaudern that it had retained what amounted to house counsel, in view of the fact that Kaudern may have been influenced thereby in his determination not to hire an independent attorney to protect his own interest.[7]

---

7. In this respect, the *Canons of Professional Ethics* relevant here read in part as follows:
  *  *  *  *  *
  6. *Adverse Influences and Conflicting Interests.*
  It is the duty of the lawyer at the time of the retainer to disclose to the client all circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

  *  *  *  *  *
  8. *Advising Upon the Merits of a Client's Cause.*
  A lawyer should endeavor to obtain full knowledge of his client's cause before advising thereon, and he is bound to give a candid opinion of the merits and probable result of pending or contemplated litigation. * * * Whenever the controversy will admit of fair adjustment, the client should be advised to avoid or to end the litigation.

For the foregoing reasons, I am of the opinion that Allstate acted in bad faith in evaluating and handling the entire matter of Collins against Kaudern. For the reasons stated above, Allstate shall be required to pay any excess judgments now outstanding against Kaudern under the Collins' suit.

Let an appropriate order be submitted.