**BOARD OF EDUCATION OF the BOROUGH OF CHATHAM, Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant.**

Civ. A. No. 1183–65.

United States District Court
D. New Jersey.

Nov. 20, 1968.

Pettit, Carlton & Higgins, by H. Frank Pettit, Westfield, N. J., for plaintiff.

Lamb, Blake, Hutchinson & Dunne, by Arthur J. Blake, Jersey City, N. J., for defendant.

## OPINION

WORTENDYKE, District Judge:

By reason of the conceded diversity of citizenship between the parties this cause was removed to this Court from the Superior Court of New Jersey in which it was originally instituted. A motion to remand to the State Court was denied by this Court's Order of December 1, 1965. The involvement of the jurisdictional minimum is uncontradicted. The case was tried in this Court without a jury, demand for which was waived after trial commenced. This Opinion is being filed in lieu of findings of fact and conclusions of law required by F.R.Civ.P. 52. Plaintiff is a municipal corporate body organized under Chapter 7 of Title 18 of the Revised Statutes of the State of New Jersey, and defendant is a casualty insurance corporation of the State of Illinois, duly authorized to transact business in the State of New Jersey.

On or about July 1, 1961 defendant, hereinafter Lumbermens, issued to plaintiff, Board, a policy of liability insurance by the terms of which Lumbermens agreed to pay in behalf of the Board all sums of money, not exceeding $200,000, which the Board might become legally obligated to pay as damages because of bodily injuries sustained accidentally during the period prescribed in the policy by any persons, and to defend any suit against the Board alleging such injuries and seeking damages therefor. By the terms of the policy Lumbermens reserved the right to make such investigation, conduct such negotiations and conclude such settlement of any claim or law suit against the Board as it deemed expedient. On January 15, 1962, while the policy was in full force and effect, Stanley Miller, a 9th grade student at Chatham Borough Junior High School operated by the Board, sustained bodily injuries resulting from an accident of the character contemplated by the terms of the policy. Thereafter Stanley and his parents made claim against the Board for damages on account of said injuries and their consequences, and instituted an action against the Board for the recovery thereof. Pursuant to the terms of the policy Lumbermens undertook an investigation of the claims alleged in the action against the Board and, through attorneys selected by Lumbermens, it conducted a defense of the

action for the enforcement of the claims. Upon the trial of the action a jury awarded damages to Stanley Miller and his parents in the aggregate sum of $1,215,140, of which $1,180,000 was awarded to Stanley and $35,140 to his parents. After the return of the verdicts the award to the infant plaintiff was reduced by the Trial Court to the sum of $300,000, but the verdict for his parents remained unmodified. The Board has paid to the plaintiffs Miller the sum of $135,140.

In its complaint in the present action the Board alleges that it was compelled to pay to and for the account of the plaintiffs Miller, in the State Court action against the Board, the sum of $135,140 by reason of Lumbermens' negligent conduct of the Miller case and its bad faith in refusing to settle the Miller claims when it had the opportunity to do so within the policy limits. Accordingly, the Board seeks to recover from Lumbermens in this action the foregoing amount of $135,140 together with interest thereon, costs of suit, counsel fees and expenses necessarily incurred in the instant litigation.

In its answer Lumbermens denies that it was guilty of any negligence or bad faith in the investigation, defense and settlement negotiations involving the Miller claims against the Board and affirmatively charges the Board with contributory negligence.

The evidence in this case fails to support a reasonable inference that the payment of which the Board complains was caused or induced by any negligence chargeable to Lumbermens. Thus the sole issue with which this Court is confronted is whether Lumbermens' failure to settle the Miller claims before verdict resulted from the insurer's lack of good faith in reaching its determination not to settle.

Since jurisdiction in this case arises by reason of the diversity of citizenship of the parties, this Court sits as if it were a Court of the State of New Jersey and must therefore apply the law in the light of its interpretation of the policy of that State. A brief review of the decisions of the New Jersey Courts, as well as those of this Court, discloses recognition of the rule that an insurer which has reserved control over settlement of claims against its insured must act in good faith when refusing to settle and its decision not to settle must be thoroughly honest, intelligent, objective and realistic when tested by the necessarily assumed expertise of the insurer. The insurer's decision not to settle must result from weighing in a fair manner the probabilities of a favorable or unfavorable verdict against the insured. Accordingly, an insurer will not be allowed to frustrate the purpose of protecting the insured by making a selfish settlement decision which exposes the insured to and results in a judgment against the insured beyond the limits of the policy. Where the insurer recognizes the probability that an adverse verdict against the insured at trial will exceed the limits of the policy, the boundaries of good faith in refusing to settle become more compressed in favor of the insured than would otherwise be the case. Where, as in the case at bar, Lumbermens reserved control over the settlement of claims against the Board and had received an offer to settle within the policy limits in the face of the probability of an adverse verdict in excess of those limits, the insurer's refusal to settle can be found to have been determined upon in good faith only by treating the settlement demand as if the Board had full coverage for whatever verdict might be recovered against it regardless of the policy limits. Bowers v. Camden Fire Insurance Ass'n, 51 N.J. 62, 237 A.2d 857 (1968). The purpose of liability insurance is to protect the insured from liability within the limits of the policy coverage. The insurer will not be permitted to frustrate that purpose by a selfish decision not to settle a claim against the insured where the insured is exposed to and suffers a judgment beyond the specific monetary protection which his premium has purchased. "The obligation assumed by the insurer with respect to

settlement is to exercise good faith in dealing with offers of compromise, having both its own and the insured's interests in mind. [A] reasonably diligent effort must be made to ascertain the facts upon which a good faith judgment as to settlement can be formulated." Radio Taxi Service, Inc. v. Lincoln Mutual Insurance Co., 31 N.J. 299, 304, 157 A.2d 319, 322 (1960); citing Southern Fire & Casualty Co. v. Norris, 35 Tenn. App. 657, 250 S.W.2d 785; 40 A.L.R.2d 208.

■ While a liability insurer may, in determining whether to accept or reject an offer of compromise of a claim against its insured properly give consideration to its own interest, it must give in good faith at least equal consideration to the interest of its insured. An insurer who assumes control over an action against its insured is bound to exercise diligence, intelligence, good faith, and honest and conscientious fidelity to the common interest of itself and its insured. When a conflict of interest arises between the insurer as agent and its insured as principal, the insurer's conduct will be subject to closer scrutiny than that of the ordinary agent because of its adverse interest. " 'The insurer must act honestly to effectively indemnify and save the insured harmless as it has contracted to do—to the extent, if necessary, that it must make whatever payment and settlement as honest judgment and discretion dictate, within the limits of the policy, * * *.' " Tennessee Farmers Mutual Insurance Co. v. Wood, 277 F.2d 21 (6 Cir. 1960); quoting from Traders & General Ins. Co. v. Rudco Oil & Gas Co., 129 F.2d 621, 627, 142 A.L.R. 799 (10 Cir. 1942). In implementing the good faith settlement standard the interests of the insured must be given at least equal consideration with those of the insurer in evaluating a settlement. In approaching its decision whether to settle or try a case against its insured, the insurer must in good faith view the situation confronting both of them as the insurer would view it if there were no policy limits ap-

plicable to the claim against the insured. Therefore the fairest method of balancing the respective interests of insurer and insured is for the insurer to treat the claim as if it alone were liable for the entire amount. Brown v. United States Fidelity and Guaranty Company, 314 F.2d 675 (2 Cir. 1963) citing Bell v. Commercial Insurance Co. of Newark, N.J., 280 F.2d 514 (3 Cir. 1960).

■ Bad faith in refusing to settle is provable by circumstantial evidence. Brown v. United States Fidelity & Guaranty Company, supra; Tennessee Farmers Mutual Insurance Company v. Wood, supra. Bad faith in that regard "is most readily inferrable when the severity of the injuries [for which damages are claimed from the insured] is such that any verdict against the insured is likely to be greatly in excess of the policy limits and further when the facts in the case indicate that a [verdict for the defendant] on the issue of liability is doubtful. * * * When these two factors coincide, and the [insurer's] company still refuses to settle, the inference of bad faith is strong." Brown v. United States Fidelity & Guaranty Company, supra, 314 F.2d at page 679. In *Bell*, supra, the Third Circuit Court of Appeals, applying the law of Pennsylvania, held, at page 515 of 280 F.2d that:

"* * * the insurer must accord the interest of its insured the same faithful consideration it gives its own interest: since the interest of one or the other may be imperiled at the instant of decision, the fairest method of balancing the interests is for the insurer to treat the claim as if it were alone liable for the entire amount. The insurer is not bound to submerge its own interest, but the decision to expose the insured to personal pecuniary loss must be based upon a bona fide belief by the insurer, predicated upon all of the circumstances of the case, that it has a good possibility of winning the lawsuit. The insurer does not have an absolute right to risk the insured's financial well-being; the insurer's obligation of good faith re-

quires that the chance of finding non-liability be real and substantial and that the decision to litigate be honestly made."

At page 516, the Court further stated: ' "And, where there is little or * * no likelihood of a verdict or even a settlement within the limits of the policy's coverage, the separate interest of the parties are in effect substantially hostile. In such circumstances, it becomes all the more apparent that the insurer must act with the utmost good faith toward the insured in disposing of claims against the latter." ' Cowden v. Aetna Casualty and Surety Co., 389 Pa. 459, 470, 134 A.2d 223 (1957).

A recent decision of Judge Coolahan of this Court in Kaudern v. Allstate Insurance Company, 277 F.Supp. 83, sheds further illumination upon the settlement obligation of a liability insurer with respect to a claim against its insured. In that case the Court, citing Brown v. Guarantee Ins. Co., 155 Cal.App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202 (1957) enumerated the following factors as relevant to the question whether an insurer had exercised the requisite degree of good faith in its negotiations for settlement of a claim against its insured. These factors are stated as follows:

1. The strength of the injured claimant's case on the issues of liability and damages;

2. Attempts by the insurer to induce the insured to contribute to the settlement;

3. Failure of the insurer to properly investigate the circumstances involved in the accident, which would result in its inability to effectively weigh the evidence against the insured;

4. The insurer's rejection of advice of its own attorney or agent;

5. Failure of the insurer to inform the insured of the compromise offer;

6. The amount of financial risk to which each party is exposed in the event of a refusal to settle; and

7. The fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts.

In *Radio Taxi Service,* supra, 31 N.J. at page 312, 157 A.2d at page 326, Mr. Justice Francis, writing for the majority of the Court, stated:

"The ultimate question is not whether a verdict in excess of the policy limits should have been anticipated but whether the insurer lacked good faith in deciding not to meet the settlement demand. Mere failure to settle within the policy limit when there was an opportunity to do so before or during trial is not evidence of bad faith. * * * The fact that the policy limit was exceeded by the verdict, in the light of hindsight may indicate a mistake of judgment. But such a mistake when resulting from a decision made with good faith regard for its own and the insured's interests does not confer a cause of action on the insured for the excess."

Against the background of case law to be found in the foregoing cited cases we proceed to review the evidence in the case at bar.

In January 1962 when Lumbermens received the report of the accident sustained by Stanley Miller, the insurer assigned its staff investigator, Edward T. Ponek, to investigate the Miller claim. He thereupon interviewed Mr. Cloidt, the physical education instructor at the Chatham School. In order to secure authorization to examine the hospital records and doctors' reports relating to Stanley's injuries and treatment, Ponek communicated with Mr. Perretti, the attorney who had been retained to represent the Miller family. He also conferred with Mr. Frahn who had recently become counsel to the Board of Education. Initially a reserve of $250 was placed upon the claim file by Lumbermens, but this was gradually increased to $15,000 just prior to Ponek's depar-

ture from Lumbermens' employment. Ponek never had occasion to recommend a settlement figure to his employer. Based upon his investigation, Ponek was of the opinion that the Board was statutorily immune from liability and that the physical education instructor, Cloidt, was probably free of negligence. Carl Frahn, Esq., became attorney for the Board in April 1963, and he thereupon wrote to Lumbermens and its attorney, Mr. Gleeson, that he had become attorney for the Board and requested that he be kept informed of developments in the Miller case. Frahn never received a formal settlement demand from counsel for the Millers. He, however, learned from Ponek that the Miller boy was very seriously and permanently injured, was receiving treatment at the Kessler Institute for Rehabilitation, and that medical and hospital expenses had already exceeded $7,400. Frahn inquired of Ponek respecting the amount of reserve being carried on the case by the insurer and was informed that it was $20,000. Respecting liability, Ponek expressed his opinion to Frahn that the insurer's reserve on the case should be raised because the case was dangerous. On July 23, 1963 Frahn was told by Lecay, an associate in Gleeson's office, that there had been no discussion of settlement of the Miller case, but that the Board would be protected by statutory immunity.

Frahn testified that his first knowledge that the amount of the settlement demand for the Miller case exceeded the policy limits was on the date of the commencement of the trial, when the demand was $350,000; but he did not discuss this figure with anyone at the time. That demand was subsequently reduced by counsel for the Miller family to $200,000, which was the policy limit. On the following day, June 12, 1964, Frahn wrote to Lumbermens advising that counsel for the Millers would accept the policy limit of $200,000 in full settlement of all claims, and stated:

"I hereby require that subject to court approval on behalf of the minor you offer the plaintiffs the said sum of two hundred thousand dollars in settlement of their claims. Should you fail to do so and subsequently any judgment is entered herein in favor of the plaintiffs for a total sum in excess of two hundred thousand dollars, you are hereby notified that the defendants will hold your company liable to pay all of such excess or overage in addition to the two hundred thousand dollars required under my client's policy.

In addition, if you should decline to make such offer at this time, on behalf of the Board of Education, I further demand that you keep me advised of the progress of all further settlement negotiations in particular, in order that there can be no misunderstanding.

You will please advise me in writing, if possible, of the last highest settlement offer made by your company and the lowest demand received or understood to have been received from the plaintiffs prior to the case being given to the jury."

To the foregoing letter Lumbermens' claims manager, Mr. Noonan, replied under date of June 17, 1964 stating in part as follows:

"Unless your demand is predicated purely upon a desire to absolutely guarantee against any possible risk of a verdict in excess of the Board of Education policy limit of two hundred thousand dollars, we would be glad to have your appraisal and opinion with respect to such legal liability on the part of the Board of Education, or on the part of Joseph Cloidt which forms the basis of your demand. We have had no suggestion from you or Mr. Cloidt or the Board of Education at any time that you or they have considered the Board of Education or Mr. Cloidt negligent in connection with the unfortunate accident sustained by Mr. Miller. We are therefore at a

loss to understand your demand that two hundred thousand dollars or any really substantial settlement should be offered to avoid a trial of the issues. Accordingly, we urge that you immediately give us your reasoning as based upon the issues involved in this lawsuit which prompts any recommendation or demand from you that a settlement greatly in excess of our present offer of thirty-four thousand dollars should be made.

In the meantime, we would hope that you would attend the trial as our trial counsel and we have invited you to do so so that you may know and evaluate the testimony of the various witnesses first-hand. We shall be very glad to keep you informed as we have in the past concerning the progress of any settlement negotiations. As you know, we have previously suggested to you that you might wish to consult with the Board of Education concerning the matter of possibly seeking a settlement of the excess exposure of the Board of Education in the conceivable event that a Jury verdict were to exceed the policy coverage of two hundred thousand dollars."

Frahn further testified that Mr. Noonan advised him that the Trial Judge in the Miller case had informed Gleeson and Noonan that the Miller family would definitely consider a figure of $150,000. In response to this either Mr. Gleeson or Mr. Noonan informed the Judge that they would recommend something in the neighborhood of $50,000 or $60,000 if it would achieve settlement; but the Judge indicated that settlement at those figures was unlikely and suggested that the trial should proceed. Frahn wrote Noonan on June 19, 1964 that he was informed that the Millers had indicated a willingness to accept $150,000 in settlement but that it was Frahn's impression that they might accept as little as $125,000. After discussing certain aspects of the evidence bearing upon the question of liability Frahn reminded Noonan that the question is not whether "we consider the

defendant negligent but what the jury could be justified in finding from the evidence presented." Noonan replied on June 25, 1964 that any appraisal of the settlement value of the case which Frahn might desire to make should be made on the basis of the entire testimony in the Miller case. On a subsequent occasion, but before a verdict, Noonan asked Frahn whether he had informed Perretti that Frahn had demanded that Lumbermens pay the policy and was assured that he had not; and on that occasion when Noonan asked Frahn whether he thought seriously Lumbermens should settle the case, Frahn answered " 'No, I think you have to take my letters for what they represent,' or words to that effect." On July 2, 1964 the jury rendered verdicts of $1,180,000 for Stanley Miller and $35,140 for his parents.

By letter dated July 28, 1964, after the jury verdicts had been returned, Frahn advised Noonan that he was concerned that he had not been contacted on the subject of settlement; reminded him that he (Noonan) had considered the case to be worth only between $50,000 and $60,000, and that he (Frahn) assumed that Noonan had reevaluated his position since that time. Frahn stated that it was his position that Lumbermens had lost its right to rely upon the policy limits and should accept full responsibility for the final verdict. He added that, if he (Noonan) did not agree with Frahn's position, some settlement discussion should be instituted with the plaintiffs prior to the hearing of the pending motion for a new trial. Upon the motion for a new trial the trial court reduced the verdict for Stanley Miller to $300,000 with the proviso that if the plaintiffs did not accept that amount, a new trial would be allowed on damages only. The verdict as so reduced was accepted by the Millers upon condition that the Board and Cloidt would agree not to appeal from the trial court's decision. That condition was met.

On January 25, 1963 the insurer had written Cloidt and the Board advising

that the damages sought in the Miller suit might exceed the amount of the insurance coverage and inviting the Board to have its own attorney associate with the attorney for the insurer, but at the Board's own expense. Frahn, the attorney for the Board, was aware of the possibility of an excess verdict and the serious extent of the injuries sustained by the Miller boy. He also advised the Board and Gleeson that he (Frahn) had recently been appointed Attorney for the Board and requested Gleeson to mark his file to show Frahn's interest in the case and requested that he be kept advised of all significant developments. Frahn had learned from Ponek that the insurer was carrying a reserve of $20,-000 and that the policy limits were $200,000.

At a conference meeting with the Board on July 23, 1963 Frahn reported the progress of the Miller case and disclosed that the medical and/or hospital expenses amounted to $15,000 "plus" and that the Miller boy was then confined at Kessler Institute with a serious bladder condition. However Frahn made no recommendation to the Board nor did the Board take any action at that time. The minutes of the Board disclose that Frahn was present and spent about 30 minutes briefing the Board on the status of the Miller case which he understood "would probably go to Court during September." Although Frahn and the Board were aware of the issue of liability in the Miller case and of the severity of the injuries from which the Miller boy was suffering, nothing was discussed at the Board Meeting respecting settlement of the case. Frahn made no further report to the Board on the Miller case until the trial thereof commenced on June 9, 1964. He had learned from Messrs. Noonan and Gleeson that no settlement discussions had been had by them with the attorney for the Millers with the exception that "it would take a million dollars to settle the case." Nevertheless, Frahn made no demand on Noonan that settlement possibilities be explored. During the trial

Noonan discussed the severity of the injuries of the Miller boy and expressed the hope that because of the statutory immunity of the Board it would be eliminated from the action at an early stage. Frahn did not, however, discuss the applicability of the statute. The trial of the Miller case extended from June 9 to July 2, 1964 and, except for the first day, the aggregate of the time spent by Frahn in court was two full days. During the trial period the Millers' attorney submitted a settlement figure of $350,-000.

To Frahn's letter of July 28, 1964 Mr. Noonan replied that if the attorney for the Millers should exhibit any interest in settlement before, during or after the motion for new trial was argued, he would advise Frahn to discuss the matter with him. After the attorney for the Millers had suggested $350,000 for settlement, which would require the Board to contribute $150,000, Frahn made no report to the Board of the demand nor did he insist that either Noonan or Gleeson pay the policy limits ($200,000). On June 12, 1964 Frahn had written Noonan stating that he required that, subject to Court approval on behalf of Stanley Miller, the insurer offer the plaintiffs the sum of $200,000, and that if the insurer declined to make such an offer it keep him [Frahn] advised of all further settlement negotiations. Subsequently, during the Miller trial Noonan requested Frahn not to tell Perretti about the existence of Frahn's letter of June 12. To this Frahn agreed. He also agreed not to discuss the matter with the Board. Noonan further suggested that the Board consider settlement of the probable excess over the policy coverage despite the fact that the attorney for the Millers had expressed willingness to accept the coverage afforded by the policy. Frahn stated that if at the time he wrote the letter of June 19 to Mr. Noonan he had been negotiating for settlement on behalf of the defendant he certainly would not have offered to pay $150,000, but would have offered less than that figure with

the intention of paying the amount demanded only as a last resort.

On November 15, 1964 a meeting of the Board was held at which Frahn was authorized "to enter into an agreement with Mr. Miller and Lumbermens Mutual Casualty Company to the effect that if Mr. & Mrs. Miller accept the $300,000 remittitur the defendant will not fight any further appeal provided said settlement has no provision affecting their rights against the insurance company on the overage."

In completion of the correspondence between them Noonan wrote to Frahn on December 16, 1964 stating in part as follows:

"In complete good faith and following our best appraisal and judgment based on our thorough investigation of all the facts and circumstances of the accident, and the counsel of our trial attorney, we did not agree to a settlement during the trial * * * of either the figure of two hundred thousand dollars or the subsequent figure of one hundred fifty thousand dollars which was submitted by attorney Perretti in behalf of the Millers as the lowest amount they would accept in settlement."

In support of his contention that in deciding not to settle Noonan and Gleeson were not exercising their best judgment, Frahn stated that "they were experienced trial counsel and claims people. The facts as we knew them at that time were such, that in my opinion, at that time, people with that kind of experience, to them it would indicate, as it indicated to me, that it was a case that warranted settlement; and that the settlement should be as high as two hundred thousand, if necessary. And that settlement negotiations should start somewhere around a hundred and twenty five thousand dollars and proceed from there."

In conclusion Frahn explained his failure to report to the Board the problems of settlement of the case during the trial as follows:

"The first time that I received a demand which was for three hundred and fifty thousand dollars, I did not feel that the case was worth over two hundred thousand, because at that time the Judge had still not indicated anything on statutory immunity and at that time also the testimony placing Mr. Cloidt in his office had not come in. And, of course, the case had not proceeded very far at all. Therefore, I saw no basis to discuss it with the Board.

Now when it had progressed to the point where I was concerned about a verdict exceeding two hundred thousand dollars and seriously concerned about it, when I heard about it the Judge was going to submit both defendants to the jury and these other things happened, at that point, the offer was down to two hundred thousand dollars, at the same conference, he said he would take the policy limits. That was one aspect of the reason and I gave this overnight, and I gave it serious thought.

The other problem, the other problem and reason entering my consideration were, first, we had presented to Mr. Perretti and were presenting at the Court the position that we didn't have anything to worry about. As you would in settlement conferences and around the courthouse. Now, I knew I had from nine to eleven people at a meeting of the Board who had various interests in this litigation, friends of the Millers. There was the risk and a very substantial one, because I was getting fed back through the members of the Board about this case that they would somehow unintentionally communicate my concern to Mr. Perretti, to the Miller family, and thence to Perretti.

This also was a concern of Mr. Noonan who mentioned it to me. Eventually, he did in the letter and verbally indicate that I might pursue this course. So that at that point, possibly I would not be running the risk of non-cooperation.

But at that point, he did give me permission. That was another reason up to that point, it would have been a question of non-cooperation because Mr. Noonan asked me not to discuss it and Mr. Gleeson also mentioned that, not to discuss the case with the Board, and I would run the risk of non-cooperation.

Then finally, even when I had the authority to go, by that time, it was down to a hundred and fifty thousand dollars and I still ran the risk because I still had the race to try to win. As far as I was concerned, Mr. Gleeson was trying to win it and we were presenting a solid front to Mr. Perretti.

I was hopeful the insurance company would make a substantial offer even if it weren't a hundred and fifty thousand dollars to save the case.

\* \* \* \* \* \*

\* \* \* I felt that there was nothing to be gained and that my client was best served by my trying to present a solid front to Mr. Perretti, that we were all together in this case, and that we didn't really feel that Mr. Perretti was going to succeed."

The Board called as a witness Peter N. Perretti, Esq., the attorney for the plaintiffs in the Miller case. From his testimony it appears that through the discovery process in that case there was a full disclosure to the Board and its insurance carrier of the theory and prospective evidence upon which the issues of liability and damages would be supported in behalf of the plaintiffs, as well as the names of witnesses intended to be called. As the case approached trial Mr. Perretti submitted to counsel for the insurance company on February 25, 1964 his initial settlement demand of $350,000. Against that demand a tentative offer of $35,000 to $50,000 was mentioned by the representative of the insurer. At a conference in the Chambers of the Judge who sat in the case the settlement demand was lowered to $200,000 and it was suggested that the Judge discuss the matter of settlement with the Millers and their attorney, out of the presence of counsel for the insurer and its claims manager, and that after that discussion the matter be further explored by the Judge in a conference with the representatives of the insurance company and its insured. The Judge suggested that an offer of $150,000 be made by the defense. To this suggestion Mr. Perretti responded:

"\* \* \* we're at two. If you will give us an offer of one, I really think we can work from there and settle the case."

Perretti explained that he felt in his mind that his adversary would understand that his invitation of an offer of $100,000 meant that he was contemplating a figure of $150,000; but he added: "\* \* \* there came a time in the presentation of the defendants' case when I, myself, wanted to back off from the willingness that \* \* \* [Mr. Miller] had exhibited at a hundred and fifty thousand dollars, because I felt, as I indicated before, that our case had perhaps been enhanced after the testimony of Mr. Cloidt."

Upon a later occasion, but before the completion of the trial, counsel for the insurer inquired of the attorney of the plaintiffs whether he would accept $75,000 in settlement if it could be obtained. The record fails to indicate that any response was made to this inquiry.

The resolution of the question whether the defendant insurer was motivated by good faith in its efforts to settle the Miller case within the Board's policy limits depends to a large degree upon the testimony of the insurer's eastern claims manager, Thomas N. Noonan, who testified for the defense in the present case. He was thoroughly experienced in the field of liability insurance claims adjustment. Although his settlement authority was limited to $10,000, he was required to submit any figure above that amount to his company's home office in Chicago with recommendations

which were usually accepted. Mr. Noonan had overall charge of the Miller case and had retained Mr. Gleeson, an able and experienced attorney, who had been representing Lumbermens for 22 years, to handle the trial.

As early as January 25, 1963 Mr. Noonan advised Mr. Cloidt, an employee of the Board and a co-defendant in the Miller case, by letter, that the complaint "could possibly present a verdict in excess of the insurance that the Board carried with * * * [Lumbermens]," and reminded the Board that it had a right to have independent counsel to represent its members. As a result of his conference with Mr. Gleeson as the case progressed through the pleading and discovery stages, Mr. Noonan recognized that very serious injuries were involved, although liability was, in his opinion, questionable. The fact that the case was pending in Morris County, New Jersey, had some influence upon both Noonan and Gleeson in their evaluation of its settlement value. Consequently a reserve of $75,000 was initially placed upon the insurer's file on the case.

About six weeks before trial of the Miller case Noonan received a settlement demand of $350,000. He discussed this demand with Mr. Gleeson and they both considered its amount "as to be not in our best judgment a realistic or serious kind of a demand. Therefore, we saw no purpose in making any counter-offer as we finally decided at that point."

Mr. Noonan attended the trial throughout its 15-day duration with the exception of one and a fraction days and conferred constantly with Mr. Gleeson and his associates as the evidence was presented. Mr. Frahn, the attorney for the Board visited the Court briefly during the trial of the case and on one occasion the $350,000 settlement demand was discussed by him with Noonan and Gleeson. In an effort to be of assistance in achieving a settlement of the case, the Trial Judge conferred in Chambers with Messrs. Perretti, Gleeson, Noonan and Lecay (Gleeson's assistant), and upon being advised by Perretti that he was demanding $350,000 in settlement, the Judge expressly recognized the probability that a verdict might be expected in excess of $100,000. Mr. Noonan however was still of the opinion that liability was uncertain. Frahn expressed no opinion respecting the settlement value or upon the liability issue prior to Perretti's reduction of his settlement demand to $200,000. Against this demand Noonan offered $34,000. He explained that that figure represented approximately one third of $100,000, which was close to the highest jury verdict estimated, i. e., between $75,000 and $125,000. During this conference in Chambers in view of the respective amounts offered and demanded, the Judge suggested "you fellows look pretty far apart. We better get on with the trial." No comment was made by Frahn upon this apparent breakdown of the negotiations. However, on June 12, 1964 there commenced an exchange of letters between Frahn and Noonan concerning which Frahn later stated to Noonan: "You understand my position here that I need to protect the interests of the Board by writing these letters." Noonan suggested to Frahn, after the attorney for the Millers had reduced his settlement demand to $150,-000, that the Board might settle any excess, and he urged Frahn to recommend to the Board that it contribute against the possibility of excess exposure. Noonan testified in this connection:

"I urged really rather than merely invited, urged Mr. Frahn to talk with the Board of Education with respect to the—if they felt there was the possibility, if they wished to avoid the possibility of an excess verdict, that they might have, and I had to concede and did readily that there was that possibility; if they wished to avoid that possibility of having to pay an excess verdict, then I thought he ought to talk with the Board about it and maybe working out a settlement of their excess over their policy limit. That we would continue, of course, with the trial and with the verdict, but they might want to do that.

Well, he said he rather doubted that they would have any authority to do such a thing.

I said, 'I still think that, Carl, you ought to talk with the Board on it and see what they think or whatever.'

But I said, 'It's up to you. It's your responsibility.' "

On June 25, 1964 Noonan advised Frahn by letter that Lumbermens would consider payment in settlement of from $50,000 to $60,000. Although Mr. Noonan had occasion to discuss settlement with Mr. Perretti on approximately 10 different occasions during the trial of the Miller case, he was unable to obtain a settlement demand of less than $150,-000 which he informed Perretti he could not recommend to his company. On one occasion Mr. Perretti told Mr. Noonan:

"If you want to make me an offer of a hundred thousand dollars, I'll have to talk with the Millers. I can't give you any encouragement. They haven't given me any."

The negotiations were finally concluded by Noonan's request that Perretti again inquire of the Millers whether their settlement demand could be brought down to $125,000 to which Perretti responded that he did not know but would think about it.

In amplification of his explanation of the abortion of the settlement discussions Noonan stated:

"Well, my responsibility was twofold, and as I saw it, not in conflict at all. One was when we were in this posture of having a hundred and fifty thousand dollars, probably as a figure that we could settle at, I then had the responsibility of weighing very carefully on behalf of my company whether we should risk our own fifty thousand dollars beyond that up to our limit of two hundred thousand dollars by continuing on with the trial or whether to accept this figure which was more and more appearing to be a final figure, the hundred and fifty thousand dollars.

If we paid the hundred and fifty thousand dollars, we quite clearly would have had a saving on our policy limit of fifty thousand dollars to Lumbermen's.

Then there was the problem, which was equally important in my appraisal of the situation, the possible verdict that might come in, if any verdict came in, of over two hundred thousand dollars. If so, how much might that be which would then have to be paid by the policyholder, the Chatham School Board.

It was my best judgment, taking into account all of the factors that appropriately should be considered in this situation, it was my best judgment that the possibility of a verdict for, number one, and if there was a verdict, the range of it in Morris County against the school district did not imbalance—give this case a settlement value of a hundred and fifty thousand dollars.

Therefore, I felt that our company should take the risk of losing, if the verdict were to go over, if there were to be a verdict, it would go over two hundred thousand dollars, that my company should take the risk of losing this additional fifty thousand dollars that was at stake. I felt it was proper and sound that our policyholder should incur the same risk of going perhaps somewhat over, having to pay something, if and when, over two hundred thousand dollars."

Noonan further stated that before reaching his conclusion he consulted with Mr. Gleeson and that their views coincided. Mr. Gleeson, an eminent trial attorney with an enviable record of success in defending negligence liability cases, testified for the defendant in this case in substantial corroboration of the testimony of Mr. Noonan. Mr. Gleeson was aware of the policy coverage limits and of the initial settlement demand of $350,000. He promptly rejected that demand as unrealistic. It was his opinion that if the Miller case were to be lost

and the plaintiffs recover verdicts therein they would not exceed one hundred fifty thousand to one hundred sixty thousand dollars. Upon another occasion during the negotiations, it was Mr. Gleeson's expressed opinion that the settlement demand of two hundred thousand dollars exceeded by forty thousand or fifty thousand the verdict value of the case. Upon reading a letter from Frahn to Noonan which demanded that the insurer pay two hundred thousand dollars in settlement of the case, Gleeson asked Frahn whether he believed that either of the defendants was liable in the case and Frahn stated that he did not. In response to Gleeson's inquiry as to why he had sent Noonan the letter, Frahn admitted that he did not believe the case was worth $200,000 in settlement but because he was the attorney for the Board he had to protect himself. It was Mr. Gleeson's testimony that Mr. Perretti never indicated that he would take less than $200,000 in settlement of the case, but he admitted that the trial Judge had informed him that Mr. Miller had stated that "if an offer of one hundred fifty thousand dollars were made, he would give serious consideration to it." At that time it was Mr. Gleeson's opinion that the settlement value of the case was $75,000. He, like Noonan, continued his efforts throughout the trial to arrange a settlement with Perretti. Some time after the medical testimony had been presented, Mr. Gleeson expressed to Mr. Noonan concern that the jury might disregard the evidence on liability and allow themselves "to be swept away by emotion or sympathy." Accordingly Gleeson then recommended that if the case could be settled up to $100,000 such disposition should be made of it. He learned from Mr. Noonan subsequently that he had received authority from his home office to go to that figure if it would achieve settlement, and that to Noonan's inquiry of Perretti whether that figure would suffice to do so, Perretti responded in the negative. Accordingly, no definite offer was made by Noonan to Perretti of $100,000 to settle. Nevertheless the settlement discussions continued daily between Gleeson and Perretti throughout the trial of the case.

We revert to the *Bell, Radio Taxi* and *Bowers* cases from which we have hereinabove made substantial quotations for guidance in our efforts to discern whether or not Lumbermens exercised good faith in refusing to settle the Miller case within the policy limitation. Since the purpose of the policy in this case was to protect the Board from liability within the limits of its coverage the insurer should not be permitted to frustrate that purpose by a selfish decision as to whether a claim against the insured should be settled where the insured is exposed to and suffers a judgment beyond the specific monetary amount which its premium has purchased. Not all of the factors for the determination of good faith as stated in *Kaudern,* supra, were present in the Miller case. The latter was strong on damages but was initially considered weak on liability. However, the liability aspect was recognized as having been enhanced by the severity of the injuries, and that enhancement was recognized by the insurer. There were attempts by the insurer to induce the Board to contribute to a settlement. There was no evidence that the insurer failed to properly investigate the circumstances surrounding the occurrence of the accident. The insurer did not reject the advice of its own attorney or agent with respect to the quantum appropriately payable in settlement, and there was no failure on the part of the insurer to inform its insured of the settlement demands. The financial risk to which both insurer and insured were exposed by the refusal to settle was substantial. There was no fault on the part of the insured which induced the insurer to reject the settlement by misleading the insurer as to the facts giving rise to the liability claim. Each of the aforementioned cases was an action by an insured against an insurer for recovery of the difference between the amount recovered by a claim-

**554**

ant against the insured and that limited by the terms of the policy. In each case the insured charged the insurer with a lack of good faith in refusing to settle within the policy limits. In *Radio Taxi* a dismissal by the trial court was affirmed on appeal. In *Bowers* a judgment upon a verdict for the insured was affirmed. In each case settlement of insured's liability to claimant within the policy limits was possible.

The evidence in the instant case persuades me that Lumbermens had the opportunity to settle the Miller case within the limits of the Board's policy, and that in refusing to do so it was not acting in good faith. As was stated in *Bowers*, 237 A.2d at p. 862, "when it is *probable* that an adverse verdict will exceed the policy limit, the propriety of an insurer's refusal to accept a settlement offer which is within the coverage requires a resolution of conflicting interests * * in view of the duty of the insurer to act in good faith, the resolution can lead to but one fair result: both interests can be served only if the insurer treats any settlement offer as if it had full coverage for whatever verdict might be recovered regardless of policy limits, and makes its decision to settle or to go to trial on that basis."

The criterion expressed in *Bowers*, supra, (51 N.J. p. 71, 237 A.2d 857) was applied in Potomac Insurance Company v. Wilkins Company, Inc., 376 F.2d 425 (10 Cir. 1967). In that case the Court of Appeals held that the evidence sustained the finding by the District Court that the insurer negligently and in bad faith failed to settle a claim against the insured within the policy limit by one who sustained spinal injury which rendered him a total and permanent quadraplegic, so that insured was entitled to recover excess of $115,000 settlement made by insured after injured person had recovered a verdict in the amount of $300,048.38, and a new trial had been granted to the insured confined solely to the issue of damages. In that case the

policy provided that the insurer might make such investigation, negotiation or settlement of any claim or suit as it deemed expedient. The trial court in the action by the insured against the insurer sat without a jury and "found that Potomac was not negligent in its investigation of the accident or its preparation of the case for trial; that the case was properly tried; that the conclusion of Potomac's counsel as to the absence of liability on the part of Wilkins Company was arrived at honestly. As to the issue of good faith, however, the court, after commenting upon the closeness of the Starks [injured person] case and the uncertainties of litigation, found as follows:

"But certainly the defendant and its counsel realized that there was always the chance that their judgment and opinion would be wrong and that this case could result in a verdict, and if it did, they certainly were advised of the probabilities that there would be a very substantial excess judgment.

* * * * * *

The evidence does not disclose any consideration by the company [insurer] of the effect upon Wilkins and Company [the insured] if they failed to accept this settlement, and all this, in view of the fact that if a judgment or a verdict was rendered in favor of the plaintiff in that Civil Action 7068, that the verdict almost had to be well in excess of the policy limits.

* * * * * *

So the Court finds that the defendant Potomac Insurance Company did not act in good faith."

The Court of Appeals in *Potomac* held [p. 427] that:

"It is well established that the [law] imposes upon the insurer the duty to exercise diligence, intelligence, good faith, and honest and conscientious fidelity to the common interest of the insured as well as itself in determining whether to accept or reject an of-

fer of settlement. While the insurer may properly give consideration to its own interest, it must in good faith give at least equal consideration to the interest of the insured, and if it fails to do so, it acts in bad faith.

\*   \*   \*   \*   \*   \*

We are satisfied that when tested by this standard, the trial court's judgment is well supported by the evidence."

And, at page 428, the Court of Appeals added:

"\*   \*   \*   While we do not cast upon Potomac the requirement of prescience, we nevertheless are satisfied that the nature of Starks' suit indicated a reasonable possibility that the case would be submitted to a jury and that a recovery substantially in excess of the $100,000 policy limit would result. Potomac was aware of the potential excess liability. It is apparent that Potomac, by refusing to negotiate a settlement above $25,000, unduly subjected Wilkins Company to liability substantially in excess of its policy coverage, and in so doing, did not afford equal consideration to the interests of Wilkins Company. Accordingly, we agree with the trial court's determination that Potomac did not act in good faith respecting the matter of settlement negotiation."

The striking parallelism between the *Potomac* case and that before me impels me to a finding of lack of good faith upon the part of Lumbermens in attempting to save some of the insurer's coverage at the risk of a verdict against the insured in excess of that coverage.

Accordingly I conclude that a judgment should be entered in favor of the Board of Education of the Borough of Chatham against Lumbermens Mutual Casualty Company for the sum of $135,140 with interest thereon from the date upon which the Board paid that amount and the costs of this action.

Let an Order in conformity with the foregoing Opinion be presented.